**BRODSKY SMITH**
Evan J. Smith, Esquire (SBN 242352)
esmith@brodskysmith.com
Ryan P. Cardona, Esquire (SBN 302113)
rcardona@brodskysmith.com
9465 Wilshire Boulevard, Suite 300
Beverly Hills, CA 90212
Phone: (877) 534-2590
Facsimile: (310) 247-0160

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LING ZHEN,<br><br>Plaintiff,<br><br>vs.<br><br>INTEVAC, INC., KEVIN BARBER, DAVID S. DURY, NIGEL HUNTON, DOTTY HAYES, MICHELE KLEIN, EIJI MIYANAGA, and RYAN VARDEMAN,<br><br>Defendants. | Case No.: 5:25-cv-2292<br><br>**Complaint For:**<br><br>(1) Violation of § 14 (e) of the Securities Exchange Act of 1934<br>(2) Violation of § 14 (d) of the Securities Exchange Act of 1934<br>(3) Violation of § 20(a) of the Securities Exchange Act of 1934<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Ling Zhen ("Plaintiff"), by and through his attorneys, alleges upon information and belief, except for those allegations that pertain to him, which are alleged upon personal knowledge, as follows:

## SUMMARY OF THE ACTION

1. Plaintiff brings this stockholder action against Intevac, Inc. ("Intevac" or the "Company") and the Company's Board of Directors (the "Board" or the "Individual Defendants," and collectively with the Company, the "Defendants"), for violations of Sections 14(e), 14(d), and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") as a result of Defendants'

efforts to sell the Company to Seagate Technology Holdings plc ("Parent") through a wholly owned subsidiary, Irvine Acquisition Holdings, Inc. ("Merger Sub," and together with Parent, "Seagate") as a result of an unfair process, and to enjoin an upcoming tender offer on a proposed all cash transaction (the "Proposed Transaction").

2. The terms of the Proposed Transaction were memorialized in a February 13, 2025, filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement"). Under the terms of the transaction, Seagate will pay $4.00 per share in cash for each Intevac share. In connection with the closing of the Transaction, Intevac will pay a one-time special dividend of $0.052 per share.

3. Thereafter, on March 3, 2025, Intevac filed a Solicitation/Recommendation Statement on Schedule 14D-9 (the "Recommendation Statement") with the SEC in support of the Proposed Transaction.

4. The Proposed Transaction is unfair for a number of reasons. Significantly, it appears as though the Board has entered into the Proposed Transaction to procure for themselves and senior management of the Company significant and immediate benefits.

5. As detailed below, the Recommendation Statement omits and/or misrepresents material information concerning, among other things: (a) the sales process and in particular certain conflicts of interest for management; (b) the financial projections for Intevac, provided by Intevac to the Company's financial advisors Houlihan Lokey Capital, Inc. ("Houlihan"); and (c) the data and inputs underlying the financial valuation analyses, that purport to support the fairness opinion by Houlihan, and provided to the Company, and the Board. Accordingly, this action seeks to enjoin the Proposed Transaction.

6. Absent judicial intervention, the Proposed Transaction will be consummated, resulting in irreparable injury to Plaintiff. This action seeks to enjoin the Proposed Transaction.

**PARTIES**

7. Plaintiff is a citizen of California and is an Intevac stockholder.

8. Defendant Intevac, together with its subsidiaries, engages in the designing, developing, and manufacturing thin-film processing systems in the United States, Europe, and Asia. The Company is incorporated in the State of Delaware, has its principal executive offices located at 3560 Bassett Street, Santa Clara, CA 95054 and its shares trade on the Nasdaq Capital Market ("NASDAQ") under the ticker symbol "IVAC."

9. Defendant Kevin Barber ("Barber") has been Chairman of the Company Board at all relevant times.

10. Defendant David S. Dury ("Dury") has been a Director of the Company at all relevant times.

11. Defendant Nigel Hunton ("Hunton") has been a Director of the Company at all relevant times. In addition, Defendant Hunton serves as the Company's President and Chief Executive Officer ("CEO").

12. Defendant Dotty Hayes ("Hayes") has been a director of the Company at all relevant times.

13. Defendant Michele Klein ("Klein") has been a Director of the Company at all relevant times.

14. Defendant Eiji Miyanaga ("Miyanaga") has been a director of the Company at all relevant times.

15. Defendant Ryan Vardeman ("Vardeman") has been a director of the Company at all relevant times.

16. Defendants identified in ¶¶ 9-15 are collectively referred to as the "Individual Defendants."

17. Non-Party Parent engages in the provision of data storage technology and infrastructure solutions in Singapore, the United States, the Netherlands, and internationally.

18. Non-Party Merger Sub is a wholly owned subsidiary of Parent created to effectuate the Proposed Transaction.

**JURISDICTION AND VENUE**

19. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act. This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have. The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

20. Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

21. Venue is proper in this District pursuant to 28 U.S.C. § 1391, because each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District; for example, the Company maintains its headquarters in this District.

**SUBSTANTIVE ALLEGATIONS**

*Company Background*

22. Intevac, together with its subsidiaries, engages in the designing, developing, and manufacturing thin-film processing systems in the United States, Europe, and Asia. It designs, develops, and markets vacuum process equipment solutions for manufacturing small substrates with precise thin-film properties, such as hard disk drive and other adjacent thin-film markets. The company sells its products primarily through its direct sales force, as well as through distributors in Japan.

*The Flawed Sales Process*

23. As detailed in the Recommendation Statement, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of the Individual Defendants and was designed with only one concern in mind – to effectuate a sale of the Company.

24. The Recommendation Statement fails to disclose the Company's reasons for creating the "Base Case" and "Downside Case" projections while negotiating the terms of the Proposed Transaction.

25. What are the "Total Management Adjustments to EBITDA" referred to in the Pro Forma Upside Case?

26. The Recommendation Statement fails to disclose whether the "Base Case" projections were provided to any of the original 10 third parties that had signed confidentiality agreements with the Company.

27. Additionally, the Recommendation Statement is silent as to the nature of the confidentiality agreement entered into between the Company and Seagate, whether this agreement differed from any other agreement with potentially interested third parties not specifically mentioned by the Recommendation Statement, if so in all specific manners.

28. The Recommendation Statement fails to provide complete disclosure of communications regarding post-transaction employment during the negotiation of the underlying transaction.

29. It is not surprising, given this background to the overall sales process, that it was conducted in an inappropriate and misleading manner.

*The Proposed Transaction*

30. On February 13, 2025, Intevac and Seagate issued a press release announcing the Proposed Transaction. The press release stated, in relevant part:

> FREMONT, Calif. & SANTA CLARA, Calif.--(BUSINESS WIRE)-- Seagate Technology Holdings plc (Nasdaq: STX) ("Seagate"), a leading innovator of mass-capacity data storage, and Intevac, Inc. (Nasdaq: IVAC) ("Intevac"), a supplier of thin-film processing systems, today announced that Seagate has entered into a definitive agreement to acquire Intevac in an all-cash transaction for $4.00 per share (the "Transaction").
>
> In connection with the closing of the Transaction, Intevac will pay a one-time special dividend of $0.052 per share. The payment of the special dividend is expected to occur on or about the closing of the Transaction. Separately, Intevac's Board of Directors has declared a regular quarterly dividend of $0.05 per share, which will be paid on March 13, 2025, to Intevac stockholders of record as of

February 28, 2025. The Transaction and the special dividend deliver aggregate consideration to Intevac stockholders of $4.052 per share, or $4.102 per share including Intevac's regular quarterly dividend. This represents a premium of 45% to Intevac's closing price of $2.83 per share on December 11, 2024, one day prior to Intevac's announcement that it had renewed its focus on pursuing strategic options, a premium of approximately 21% to Intevac's closing price of $3.38 per share on February 12, 2025 and an aggregate value of approximately $119 million including both dividends.

As a result of the Transaction, Intevac will no longer hold its earnings call, which was previously scheduled for February 25, 2025.

Transaction Details

The definitive agreement provides for Seagate to launch an all-cash tender offer for all of Intevac's outstanding shares for $4.00 per share in cash, to be commenced as promptly as reasonably practicable. The consummation of the tender offer is subject to a minimum tender condition of at least one share more than 50% of Intevac's issued and outstanding shares, as well as other customary closing conditions. Following successful completion of the tender offer, the definitive agreement provides for Seagate to acquire all remaining shares not tendered in the offer through a second step merger at the same $4.00 per share all-cash price as the tender offer. The special dividend of $0.052 per share and the regular quarterly dividend of $0.05 per share are in addition to the $4.00 cash consideration in the Transaction. Intevac's Board of Directors unanimously approved the Transaction and recommends that all stockholders tender their shares in the offer. In addition to the approval by Intevac's Board of Directors, two of Intevac's largest stockholders, Palogic Value Fund, L.P. and Bleichroeder LP, who together represent approximately 22% of Intevac's outstanding shares, have entered into customary agreements to support the Transaction.

The Transaction is expected to close in late March or early April 2025, subject to the satisfaction of customary closing conditions. Seagate expects the Transaction to be accretive to the company's non-GAAP earnings per share ("EPS") over the long-term and have minimal impact to non-GAAP EPS over the short-term.

*Potential Conflicts of Interest*

31. The breakdown of the benefits of the deal indicates that Company insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders such as Plaintiff. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff as a public stockholder of Intevac.

32. Company insiders currently own large, illiquid portions of Company stock and large amounts of company options, which will be converted into the Merger Consideration not shared with public Company stockholders such as Plaintiff upon the consummation of the Proposed Transaction as follows:

| Name of Executive Officer or Director | Shares Owned (#) | Total Offer Consideration for Shares ($) | Special Dividend Amount Payable for Shares ($) |
|---|---|---|---|
| **Executive Officers** | | | |
| Nigel D. Hunton. | 283,122 | 1,132,488 | 14,722 |
| Cameron McAulay | 2,500 | 10,000 | 130 |
| John Dickinson | 49,860 | 199,440 | 2,593 |

7

| Name of Executive Officer or Director | Shares Owned (#) | Total Offer Consideration for Shares ($) | Special Dividend Amount Payable for Shares ($) |
|---|---|---|---|
| **Directors** | | | |
| Kevin D. Barber | 56,000 | 224,000 | 2,912 |
| David S. Dury | 212,000 | 848,000 | 11,024 |
| Dorothy D. Hayes | 47,000 | 188,000 | 2,444 |
| Michele F. Klein | 52,000 | 208,000 | 2,704 |
| Eiji Miyanaga | — | — | — |
| Ryan L. Vardeman | 1,053,924[1] | 4,215,696 | 54,804 |

| ame of Executive Officer or Director | Number of Shares Underlying In-the-Money Options (#) | Offer Consideration for In-the-Money Options ($) |
|---|---|---|
| **Executive Officers** | | |
| Nigel D. Hunton | — | — |
| Cameron McAulay | — | — |
| John Dickinson | — | — |
| **Directors** | | |
| Kevin D. Barber | — | — |
| David S. Dury | — | — |
| Dorothy D. Hayes | — | — |
| Michele F. Klein | — | — |
| Eiji Miyanaga | 10,300 | 4,738 |
| Ryan L. Vardeman | 10,300 | 14,935 |

33. Company insiders currently own large, illiquid portions of Company RSUs and Company PRSUs some of which will be exchanged for the merger consideration upon the consummation of the Proposed Transaction, not shared amongst Plaintiff and other public stockholders of the Company. The Recommendation Statement provides the following but does not account for the merger consideration each of these amounts will be exchanged for upon the consummation of the Proposed Transaction:

| Name of Executive Officer or Director | Number of Company RSUs (#) | Total Offer Consideration for Company RSUs ($) |
|---|---|---|
| **Executive Officers** | | |
| Nigel D. Hunton | 277,985 | 1,111,940 |
| Cameron McAulay | 138,000 | 552,000 |
| John Dickinson | 113,581 | 454,324 |
| **Directors** | | |
| Kevin D. Barber | 12,000 | 48,000 |
| David S. Dury | 12,000 | 48,000 |
| Dorothy D. Hayes | 12,000 | 48,000 |
| Michele F. Klein | 12,000 | 48,000 |
| Eiji Miyanaga | 12,000 | 48,000 |
| Ryan L. Vardeman | 12,000 | 48,000 |

| Name of Executive Officer or Director | Cashed-Out 2022 Company PRSUs (#) | Cashed-Out 2025 Company PRSUs (#) | Total Offer Consideration for Company PRSUs ($) |
|---|---|---|---|
| **Executive Officers** | | | |
| Nigel D. Hunton | 166,750 | 240,000 | 1,627,000 |
| Cameron McAulay | — | 135,000 | 540,000 |
| John Dickinson | 20,650 | 75,000 | 382,600 |
| **Directors** | | | |
| Kevin D. Barber | — | — | — |
| David S. Dury | — | — | — |
| Dorothy D. Hayes | — | — | — |
| Michele F. Klein | — | — | — |
| Eiji Miyanaga | — | — | — |
| Ryan L. Vardeman | — | — | — |

34. In addition, employment agreements with certain Intevac executives entitle such executives to severance packages should their employment be terminated under certain circumstances. These 'golden parachute' packages are significant and will grant each director or officer entitled to them millions of dollars, compensation not shared by Plaintiff. The golden

parachute compensation is as follows:

| Name | Cash ($)[1] | Equity ($)[2] | Perquisites/ Benefits ($)[3] | Total ($)[4] |
|---|---|---|---|---|
| Nigel D. Hunton | 1,902,174 | 2,738,940 | 82,890 | 4,724,004 |
| Cameron McAulay | 646,104 | 1,092,000 | — | 1,738,104 |
| John Dickinson | 620,600 | 836,924 | 46,272 | 1,503,796 |

| Name | Base Salary Severance ($) | Target Bonus Severance ($) | Prorated Target Bonus Severance ($) |
|---|---|---|---|
| Nigel D. Hunton | 900,900 | 900,900 | 100,374 |
| Cameron McAulay | 380,000 | 228,000 | 38,104 |
| John Dickinson | 365,000 | 219,000 | 36,600 |

| Name | Company Options ($) | Company RSUs ($) | Company PRSUs ($) | Total ($) |
|---|---|---|---|---|
| Nigel D. Hunton | — | 1,111,940 | 1,627,000 | 2,738,940 |
| Cameron McAulay | — | 552,000 | 540,000 | 1,092,000 |
| John Dickinson | — | 454,324 | 382,600 | 836,924 |

35. The Recommendation Statement also fails to adequately disclose communications regarding post-transaction employment, if any, which took place during the negotiation of the underlying transaction. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders.

*36.* Thus, while the Proposed Transaction is not in the best interests of Intevac, Plaintiff, or Company stockholders, it will produce lucrative benefits for the Company's officers and directors.

*The Materially Misleading and/or Incomplete Recommendation Statement*

37. The Intevac Board caused to be filed with the SEC a materially misleading and incomplete Recommendation Statement, that in violation the Exchange Act, failed to provide Plaintiff in his capacity as a Company stockholder with material information and/or provides materially misleading information critical to the total mix of information available to Plaintiff concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Transaction*

38. The Recommendation Statement fails to disclose material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction. In particular, the Recommendation Statement fails to disclose:

    a. The Company's reasons for creating the "Base Case" and "Downside Case" projections while negotiating the terms of the Proposed Transaction;

    b. What the "Total Management Adjustments to EBITDA" referred to in the Pro Forma Upside Case are;

    c. Whether the "Base Case" projections were provided to any of the original 10 third parties that had signed confidentiality agreements with the Company;

    d. Whether the terms of any confidentiality agreements entered during the sales process between Company on the one hand, and any other third party (including Seagate), if any, differed from one another, and if so, in what way; and

    e. Communications regarding post-transaction employment during the negotiation of the underlying transaction.

*Omissions and/or Material Misrepresentations Concerning Intevac's Financial Projections*

39. The Recommendation Statement fails to provide material information concerning financial projections for Intevac provided by Intevac management and relied upon by Houlihan in its analyses.

40. Notably, in its fairness opinion, Houlihan indicates that it reviewed, "certain information relating to the historical, current and future operations, financial condition and prospects of Intevac made available to Houlihan Lokey by Intevac, including the Base Case; for further information regarding the Base Case and the other Forecasts, see the section of this Schedule 14D-9 captioned ("—Certain Company Management Forecasts").

41.     The Recommendation Statement, therefore, should have, but fails to provide, certain information in the projections that Intevac management provided to the Board and Houlihan. Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

42.     With regard to *Certain Company Management Forecasts – Base Case*, the Recommendation Statement fails to disclose material line items, including the following:

    a. Total Net Revenue, including the underlying inputs, metrics, and assumptions used to determine same;

    b. Direct Cost of Sales, including the underlying inputs, metrics, and assumptions used to determine same;

    c. Direct Margin, including the underlying inputs, metrics, and assumptions used to determine same;

    d. Other Cost of Sales, including the underlying inputs, metrics, and assumptions used to determine same;

    e. Total Cost of Sales, including the underlying inputs, metrics, and assumptions used to determine same;

    f. Research and Development, including the underlying inputs, metrics, and assumptions used to determine same;

    g. Management, General and Administrative, including the underlying inputs, metrics, and assumptions used to determine same;

    h. Depreciation and Amortization, including the underlying inputs, metrics, and assumptions used to determine same;

    i. EBITDA, including the underlying inputs, metrics, and assumptions used to determine same;

j. EBIT, including the underlying inputs, metrics, and assumptions used to determine same;

k. Taxes, including the underlying inputs, metrics, and assumptions used to determine same;

l. Unlevered Earnings, including the underlying inputs, metrics, and assumptions used to determine same;

m. Capital Expenditures, including the underlying inputs, metrics, and assumptions used to determine same;

n. Change in Net Working Capital, including the underlying inputs, metrics, and assumptions used to determine same;

o. Cash Flow Adjustment, including the underlying inputs, metrics, and assumptions used to determine same; and

p. Unlevered Free Cash Flow, including the underlying inputs, metrics, and assumptions used to determine the same.

43. With regard to *Certain Company Management Forecasts – Pro Forma Upside Case*, the Recommendation Statement fails to disclose material line items, including the following:

a. Total Revenue, including the underlying inputs, metrics, and assumptions used to determine same;

b. Direct COGS, including the underlying inputs, metrics, and assumptions used to determine same;

c. Other Cost of Sales, including the underlying inputs, metrics, and assumptions used to determine same;

d. Total Cost of Revenues, including the underlying inputs, metrics, and assumptions used to determine same;

e. Gross Profit, including the underlying inputs, metrics, and assumptions used to determine same;

COMPLAINT

   f. Management, General and Administrative, including the underlying inputs, metrics, and assumptions used to determine same;

   g. R&D, including the underlying inputs, metrics, and assumptions used to determine same;

   h. Total Opex, including the underlying inputs, metrics, and assumptions used to determine same;

   i. EBIT, including the underlying inputs, metrics, and assumptions used to determine same;

   j. Total Other Income, Interest and Taxes (Loss), including the underlying inputs, metrics, and assumptions used to determine same;

   k. Net Income, including the underlying inputs, metrics, and assumptions used to determine same;

   l. Total Non-GAAP Adjustments, including the underlying inputs, metrics, and assumptions used to determine same;

   m. Total Management Adjustments to EBITDA, including the underlying inputs, metrics, and assumptions used to determine same; and

   n. Adjusted EBITDA, including the underlying inputs, metrics, and assumptions used to determine the same.

  44. With regard to *Certain Company Management Forecasts – Pro Forma Upside Case*, the Recommendation Statement fails to disclose material line items, including the following:

   a. Total Revenue, including the underlying inputs, metrics, and assumptions used to determine same;

   b. Direct Cost of Sales, including the underlying inputs, metrics, and assumptions used to determine same;

   c. Opex, including the underlying inputs, metrics, and assumptions used to determine same;

- 13 -
COMPLAINT

d. EBIT, including the underlying inputs, metrics, and assumptions used to determine same;

e. EBITDA, including the underlying inputs, metrics, and assumptions used to determine same;

f. Net Income, including the underlying inputs, metrics, and assumptions used to determine same;

g. Depreciation and Amortization, including the underlying inputs, metrics, and assumptions used to determine same;

h. Equity-Based Compensation, including the underlying inputs, metrics, and assumptions used to determine same;

i. Deferred Income Taxes, including the underlying inputs, metrics, and assumptions used to determine same;

j. Change in Net Working Capital, including the underlying inputs, metrics, and assumptions used to determine same;

k. Cash Used in Investing Activities, including the underlying inputs, metrics, and assumptions used to determine same;

l. Rental – Cash Payment above impairment, including the underlying inputs, metrics, and assumptions used to determine same;

m. ERC, including the underlying inputs, metrics, and assumptions used to determine same;

n. Residual Severance Payments, including the underlying inputs, metrics, and assumptions used to determine same; and

o. Total Cash Generation, including the underlying inputs, metrics, and assumptions used to determine the same.

45. The Recommendation Statement fails to disclose why the "Base Case" projections were necessary, as well as why the "Base Case" projections came in at reduced totals compared to the "Pro Forma Upside Case" which had been created prior to the "Base Case" projections.

46. Moreover, the Recommendation Statement fails to disclose when the "Downside Case" projections were created and why the Company deemed it necessary to create them.

47. This information is necessary to provide Plaintiff in his capacity as a Company stockholder, with a complete and accurate picture of the sales process and its fairness. Without this information, Plaintiff is not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

48. Without accurate projection data presented in the Recommendation Statement, Plaintiff is unable to properly evaluate the Company's true worth, the accuracy of Houlihan's financial analyses, or make an informed decision whether to tender his shares in favor of the Proposed Transaction. As such, the Board is in violation of the Exchange Act by failing to include such information in the Recommendation Statement.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by Houlihan*

49. In the Recommendation Statement, Houlihan describes its fairness opinion and the various valuation analyses performed to render such opinion. However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions. Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

50. With respect to the *Selected Companies Analysis*, the Recommendation Statement fails to disclose the following:

    a. The specific data analyzed for each of the selected companies;

    b. The enterprise value ("EV") for each of the selected companies;

    c. The EV to Adjusted EBITDA CY 2025E multiple for each of the selected companies, including the inputs, metrics, and assumptions used to calculate same;

d. The EV to Adjusted EBITDA CY 2026E multiple for each of the selected companies, including the inputs, metrics, and assumptions used to calculate same;

　　　　　e. The EV to Adjusted EBITDA CY 2027E multiple for each of the selected companies, including the inputs, metrics, and assumptions used to calculate same; and

　　　　　f. The inputs, metrics, and assumptions used to determine the EV/2026E Revenue Trading Multiples reference range of 4.0x to 6.0x utilized.

　　51. With respect to the *Discounted Cash Flow Analysis*, the Recommendation Statement fails to disclose the following:

　　　　　a. The inputs, metrics, and assumptions used to determine the Company's perpetuity growth rate range of (2%) to 2% utilized;

　　　　　b. The inputs, metrics, and assumptions used to determine the discount rates ranging from 14% to 18% utilized; and

　　　　　c. The Company's weighted average cost of capital utilized.

　　52. These disclosures are critical for Plaintiff to be able to make an informed decision on whether to tender his shares in favor of the Proposed Transaction.

　　53. Without the omitted information identified above, Plaintiff is missing critical information necessary to evaluate whether the proposed consideration truly maximizes his value and serves his interest as a stockholder. As such, the Board has violated the Exchange Act by failing to include such information in the Recommendation Statement.

- 16 -
COMPLAINT

## FIRST COUNT

## Violations of Section 14(e) of the Exchange Act

## **(Against All Defendants)**

54. Plaintiff repeats all previous allegations as if set forth in full herein.

55. Defendants have disseminated the Recommendation Statement with the intention of soliciting stockholders, including Plaintiff, to tender their shares in favor of the Proposed Transaction.

56. Section 14(e) of the Exchange Act provides that in the solicitation of shares in a tender offer, "[i]t shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading[.]"

57. The Recommendation Statement was prepared in violation of Section 14(e) because it is materially misleading in numerous respects and omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants knew or should have known that the Recommendation Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

58. The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

59. The Individual Defendants were at least negligent in filing a Recommendation Statement that was materially misleading and/or omitted material facts necessary to make the Recommendation Statement not misleading.

60. The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to decide whether to tender his shares on the basis of complete information if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer period regarding the Proposed Transaction.

61. Plaintiff has no adequate remedy at law.

## SECOND COUNT

## Violations of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9

### (Against all Defendants)

62. Plaintiff repeats and realleges all previous allegations as if set forth in full herein.

63. Defendants have disseminated the Recommendation Statement with the intention of soliciting stockholders, including Plaintiff, to tender their shares in favor of the Proposed Transaction.

64. Section 14(d)(4) requires Defendants to make full and complete disclosure in connection with a tender offer.

65. SEC Rule 14d-9 requires a Company's directors to furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading.

66. Here, the Recommendation Statement violates both Section 14(d)(4) and SEC Rule 14d-9 because it because it is materially misleading in numerous respects, omits material facts, including those set forth above and Defendants knowingly or recklessly omitted the material facts from the Recommendation Statement.

67. The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to decide whether to tender his shares on the basis of complete information if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer period regarding the Proposed Transaction.

68. Plaintiff has no adequate remedy at law.

## THIRD COUNT

## Violations of Section 20(a) of the Exchange Act

### (Against all Individual Defendants)

69. Plaintiff repeats all previous allegations as if set forth in full herein.

70. The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations

and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or should have known that the Recommendation Statement was materially misleading to Plaintiff in his capacity as a Company stockholder.

71. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Recommendation Statement and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws. The Individual Defendants were able to, and did, control the contents of the Recommendation Statement. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the Recommendation Statement before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

72. The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Intevac's business, the information contained in its filings with the SEC, and its public statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from Plaintiff and Company, and that the Recommendation Statement was misleading. As a result, the Individual Defendants are responsible for the accuracy of the Recommendation Statement and are therefore responsible and liable for the misrepresentations contained herein.

73. The Individual Defendants acted as controlling persons of Intevac within the meaning of Section 20(a) of the Exchange Act. Because of their position with the Company, the Individual Defendants had the power and authority to cause Intevac to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Intevac and all of its employees. As alleged above, Intevac is a primary violator of Section 14 of the Exchange Act and

- 19 -
COMPLAINT

SEC Rule 14a-9. By reason of their conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in his favor and against the Defendants, as follows:

A. Enjoining the Proposed Transaction;

B. In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff;

C. Directing the Individual Defendants to comply with the Exchange Act and to disseminate a Recommendation Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E. Granting such other and further relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: March 5, 2025

**BRODSKY SMITH**

By: *Evan J. Smith*
Evan J. Smith, Esquire (SBN 242352)
esmith@brodskysmith.com
Ryan P. Cardona, Esquire (SBN 302113)
rcardona@brodskysmith.com
9465 Wilshire Blvd., Ste. 300
Phone: (877) 534-2590
Facsimile (310) 247-0160

*Attorneys for Plaintiff*